**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| 1 | MARY OFISI | : |
| 2 | Aaron Makau Ndivo | : | CASE NO: _____ |
| 3 | Adam Titus Wamai | : |
| 4 | Agnes Kubai | : |
| 5 | Agnes Wanjiku Ndungu | : |
| 6 | Aisha Kambenga | : |
| 7 | Alex Mbugua | : |
| 8 | Alex Munguti | : |
| 9 | Alexander Vrontamitis | : |
| 10 | Ali Hussein Ali | : |
| 11 | Alice Kiongo | : |
| 12 | Alice Maritim | : |
| 13 | Alice Mary Talbot | : |
| 14 | Alison Maffry | : |
| 15 | Allan Olao | : |
| 16 | Ally Mahundi | : |
| 17 | Amiri Mahundi | : |
| 18 | Anastasia Gianpoulos | : |
| 19 | Andrew Ofisi | : |
| 20 | Andrew Onono | : |
| 21 | Andrew Pussy | : |
| 22 | Angela Bonyo | : |
| 23 | Angela Mwongeli Mutiso | : |
| 24 | Angela Wamai | : |
| 25 | Anipha Mpoto | : |
| 26 | Ann Mbogo | : |
| 27 | Ann Ruguru | : |
| 28 | Ann Salamba | : |
| 29 | Ann Wairimu Kiarie | : |

| 30 | Annah Maritim | : | |
| 31 | Annah Wangechi | : | |
| 32 | Annastaciah Lucy Boulden | : | |
| 33 | Anne Adundo | : | |
| 34 | Anne Nganga Mwangi | : | |
| 35 | Anthony Kiarie | : | |
| 36 | Anthony Njoroge | : | |
| 37 | Aquilas Kalio | : | |
| 38 | Asha Kiluwa | : | |
| 39 | Asha Mahundi | : | |
| 40 | Audrey Pussy | : | |
| 41 | August Maffry | : | |
| 42 | Badawy Itati Ali | : | |
| 43 | Bakari Nyumbu | : | |
| 44 | Barbara Kiarie | : | |
| 45 | Barbara Muli | : | |
| 46 | Barbara Olao | : | |
| 47 | Barnabas Onyango | : | |
| 48 | Beatrice Amduso | : | |
| 49 | Beatrice Atinga | : | |
| 50 | Beatrice Bwaku | : | |
| 51 | Beatrice Martha Kithuva | : | |
| 52 | Belinda Akinyi Adika | : | |
| 53 | Belinda Chaka | : | |
| 54 | Belinda Maloba | : | |
| 55 | Belonce Murigi | : | |
| 56 | Benson Bwaku | : | |
| 57 | Benson Malusi Musyoka | : | |
| 58 | Benson Ndegwa | : | |
| 59 | Bernard Adundo | : | |
| 60 | Bernard Macharia | : | |
| 61 | Bernard Mutunga Kaswii | : | |

| | | |
|---|---|---|
| 62 | Bernard Onsongo | : |
| 63 | Bernice Ndeti | : |
| 64 | Beryl Shiumbe | : |
| 65 | Betty Kagai | : |
| 66 | Beverlyne Ndeda | : |
| 67 | Blasio Kubai | : |
| 68 | Boniface Chege | : |
| 69 | Brian Kubai | : |
| 70 | Bryan Omori | : |
| 71 | Caroline Karigi | : |
| 72 | Caroline Kasungo Mgali | : |
| 73 | Caroline Ngugi Kamau | : |
| 74 | Caroline Okech | : |
| 75 | Caroline Wanjiru Gichuru | : |
| 76 | Caroline Wanjuri Kamau | : |
| 77 | Catherine Gitau | : |
| 78 | Catherine Gitumbu Kamau | : |
| 79 | Catherine Kalio | : |
| 80 | Catherine Mwangi | : |
| 81 | Catherine Njeri Mwangi | : |
| 82 | Celestine Kubai | : |
| 83 | Charles Kabui | : |
| 84 | Charles Kagai | : |
| 85 | Charles Mungoma Olambo | : |
| 86 | Charles Mwaka Mulwa | : |
| 87 | Charles Mwangi Ndibui | : |
| 88 | Charles Mwirigi Nkanatha | : |
| 89 | Charles Ochola | : |
| 90 | Charles Olewe | : |
| 91 | Charles Opondo | : |
| 92 | Christant Hiza | : |
| 93 | Christine Kavai Busera | : |

| 94  | Christine Mikali Kamau     | : |
| 95  | Christine Nabwire Bwaku    | : |
| 96  | Christopher Ndiritu        | : |
| 97  | Civilier Mwaka             | : |
| 98  | Clara Owino                | : |
| 99  | Clifford Tarimo            | : |
| 100 | Collin Kubai               | : |
| 101 | Collins Aliviza            | : |
| 102 | Conceptor Orende           | : |
| 103 | Cornelius Kebungo          | : |
| 104 | Daniel Kiarie              | : |
| 105 | Daniel Kiongo Kamau        | : |
| 106 | Daniel Kuya                | : |
| 107 | Daniel Owiti Oloo          | : |
| 108 | David Kamau                | : |
| 109 | David Kiarie Kiburu        | : |
| 110 | David Ngugi                | : |
| 111 | Dawn Mulu                  | : |
| 112 | Debora Gwaro               | : |
| 113 | Debra Mayaka               | : |
| 114 | Dennis Okatch              | : |
| 115 | Derrick Maloba             | : |
| 116 | Diana Kibodya              | : |
| 117 | Diana Macharia             | : |
| 118 | Diana Nyangara             | : |
| 119 | Diana Williams             | : |
| 120 | Dick Obworo Mayaka         | : |
| 121 | Dickson Lihanda            | : |
| 122 | Dixon Indiya               | : |
| 123 | Dominic Musyoka Kithuva    | : |
| 124 | Doreen Mayaka              | : |
| 125 | Doreen Oport               | : |

| 126 | Doreen Pussy | : |
| 127 | Dorine Bonyo | : |
| 128 | Duncan Nyoike Kamau | : |
| 129 | Edgar Maritim | : |
| 130 | Edith Njeri | : |
| 131 | Edmund Kiarie Kiburu | : |
| 132 | Edward Kung'u | : |
| 133 | Edward Mwae Muthama | : |
| 134 | Edwin Omori | : |
| 135 | Edwin Onsongo | : |
| 136 | Edwin Oyoo | : |
| 137 | Edwina Owuor | : |
| 138 | Elijah Bonyo Ochieng | : |
| 139 | Elizabeth Kiato | : |
| 140 | Elizabeth Maloba | : |
| 141 | Elizabeth Muli-Kibue | : |
| 142 | Elizabeth Nzaku | : |
| 143 | Elizabeth Okelo | : |
| 144 | Elizabeth Tarimo | : |
| 145 | Elly Musalia | : |
| 146 | Elsie Kagimbi | : |
| 147 | Elsie Pussy | : |
| 148 | Emily Minayo | : |
| 149 | Emma Mahundi | : |
| 150 | Emmanuel Gwaro | : |
| 151 | Emmanuel Minja | : |
| 152 | Emmanuel Musambayi Busera | : |
| 153 | Emmily Bulimu | : |
| 154 | Enna Omolo | : |
| 155 | Enoch Onsongo | : |
| 156 | Enos Nzalwa | : |
| 157 | Ephantus Njagi Mbogo | : |

| 158 | Ephraim Onyango Bwaku | : |
| 159 | Erastus Ndeda | : |
| 160 | Eric Abur Onyango | : |
| 161 | Eric Mwaka | : |
| 162 | Ernest Gitau | : |
| 163 | Ester Nganga Mwangi | : |
| 164 | Eucabeth Gwaro | : |
| 165 | Evans Onsongo | : |
| 166 | Evitta Francis Kwimbere | : |
| 167 | Faith Kihato | : |
| 168 | Faith Maloba | : |
| 169 | Faith Murigi | : |
| 170 | Faith Mutindi | : |
| 171 | Faith Wanza Kamau | : |
| 172 | Felister Gitau | : |
| 173 | Felix Munguti | : |
| 174 | Felix Mwaka | : |
| 175 | Flavia Kiyanga | : |
| 176 | Florence Musalia | : |
| 177 | Florence Omori | : |
| 178 | Francis Kwimbere | : |
| 179 | Francis Maina Ndibui | : |
| 180 | Francis Mbogo Njung'e | : |
| 181 | Francis Ndungu Mbugua | : |
| 182 | Francis Ofisi | : |
| 183 | Francis Olewe Ochilo | : |
| 184 | Francis Watoro Maina | : |
| 185 | Franciso Kyalo | : |
| 186 | Frederick Kibodya | : |
| 187 | Frederick Kwimbere | : |
| 188 | Frederick Maloba | : |
| 189 | Frida Bulimu | : |

| | | |
|---|---|---|
| 190 | Frida Yohan Mtitu | : |
| 191 | Fridah Makena | : |
| 192 | Gad Gideon Achola | : |
| 193 | Gaudens Thomas Kunambi | : |
| 194 | Geoffrey Kalio | : |
| 195 | Geoffrey Moses Namai | : |
| 196 | Geoffrey Tupper | : |
| 197 | George Magak Mimba | : |
| 198 | George Mwangi | : |
| 199 | George Onsongo | : |
| 200 | Gerald Bochart | : |
| 201 | Gerald Owino | : |
| 202 | Gideon Maritim | : |
| 203 | Gideon Ofisi | : |
| 204 | Gitonga Mwanike | : |
| 205 | Gladis Lihanda | : |
| 206 | Gladys Munani Musyoka | : |
| 207 | Gladys Onsongo | : |
| 208 | Godfrey Bulimu | : |
| 209 | Grace (Eunice) Onsongo | : |
| 210 | Grace Gicho | : |
| 211 | Grace Godia | : |
| 212 | Grace Kimani | : |
| 213 | Grace Kimata | : |
| 214 | Grace Makasi Paul | : |
| 215 | Grace Wanjiru Waithira | : |
| 216 | Greg Owino | : |
| 217 | Hamida Idi | : |
| 218 | Hannah Ngenda Kamau | : |
| 219 | Hannah Wambui | : |
| 220 | Harriet Chore | : |
| 221 | Harrison Kimani | : |

| 222 | Hellen Maritim | : |
| 223 | Hellen Okelo | : |
| 224 | Henry Aliviza Shitiavai | : |
| 225 | Henry Bathazar Kessy | : |
| 226 | Hesbon Bulimu | : |
| 227 | Hesbon Lihanda | : |
| 228 | Hilario Ambrose Fernandes | : |
| 229 | Hindu Omari Idi | : |
| 230 | Hosiana Mbaga | : |
| 231 | Hudson Chore | : |
| 232 | Humphrey Aliviza | : |
| 233 | Humphrey Kiburu | : |
| 234 | Hussein Ramadhani | : |
| 235 | Immanuel Mdobilu | : |
| 236 | Inosensia Mpoto | : |
| 237 | Ireen Semo | : |
| 238 | Irene Khabuchi | : |
| 239 | Irene Kung'u | : |
| 240 | Irene Kwimbere | : |
| 241 | Isaac Kariuki Mbogo | : |
| 242 | Isidore Adundo | : |
| 243 | Jacinta Wahome | : |
| 244 | Jackline Achieng | : |
| 245 | Jackson Bulimu | : |
| 246 | Jackson Kithuva Musyoka | : |
| 247 | Jackson Ndungu | : |
| 248 | Jacob Gati | : |
| 249 | Jacqueline Aliviza | : |
| 250 | Jacqueline Kihato | : |
| 251 | Jael Oyoo | : |
| 252 | Jairus David Aura | : |
| 253 | James Chaka | : |

| | | |
|---|---|---|
| 254 | James Mukabi | : |
| 255 | James Ndeda | : |
| 256 | Jamleck Gitau Ndungu | : |
| 257 | Janathan Okech | : |
| 258 | Jane Ikonye Kiarie | : |
| 259 | Jane Kamau | : |
| 260 | Jane Kathuka | : |
| 261 | Jane Khabuchi | : |
| 262 | Jane Mutua | : |
| 263 | Japeth Godia | : |
| 264 | Jeffrey Mbugua | : |
| 265 | Jennifer Njeri | : |
| 266 | Jennifer Wambui | : |
| 267 | Jerry Omori | : |
| 268 | Joab Amduso | : |
| 269 | Joan Adundo | : |
| 270 | Joan Kamau | : |
| 271 | Joan Kendi Nkanatha | : |
| 272 | Joanne Oport | : |
| 273 | Joash Okindo | : |
| 274 | Joel Gitumbu Kamau | : |
| 275 | John Kiswili | : |
| 276 | John Mdobilu | : |
| 277 | John Muiru Ndungu | : |
| 278 | John Muriuki | : |
| 279 | John Ndibui | : |
| 280 | John Nduati | : |
| 281 | John Ngugi | : |
| 282 | John Ngure | : |
| 283 | John Ofisi | : |
| 284 | Jomo Matiko Boke | : |
| 285 | Jonathan Nduti | : |

| 286 | Joseph Abdallah | : |
|-----|----------------|---|
| 287 | Joseph Gathunga | : |
| 288 | Joseph Ingosi | : |
| 289 | Joseph Kamau Kiongo | : |
| 290 | Joseph Kambo | : |
| 291 | Joseph Ndungu Waithira | : |
| 292 | Joseph Wahome | : |
| 293 | Joshua Mayunzu | : |
| 294 | Josiah Owuor | : |
| 295 | Josinda Katumba Kamau | : |
| 296 | Jotham Godia | : |
| 297 | Joyce Mutheu | : |
| 298 | Joyce Onyango | : |
| 299 | Joyce Thadei Lokoa | : |
| 300 | Judith Nandi Busera | : |
| 301 | Judy Aliviza | : |
| 302 | Judy Kiarie | : |
| 303 | Juliana Onyango | : |
| 304 | Juliet Olewe | : |
| 305 | Julius Nyamweno | : |
| 306 | Julius Nzivo | : |
| 307 | Julius Ogoro | : |
| 308 | Juma Mahundi | : |
| 309 | Juruha Musalia | : |
| 310 | Justin Amduso | : |
| 311 | Justina Mdobilu | : |
| 312 | Kaka Abubakar Iddi | : |
| 313 | Kamali Musyoka Kithuva | : |
| 314 | Katherine Mdobilu | : |
| 315 | Katherine Mwaka | : |
| 316 | Katimba Mohamed Selemani | : |
| 317 | Keeliy Musyoka | : |

| | | |
|---|---|---|
| 318 | Kelesendhia Apondi Onyango | : |
| 319 | Kennedy Okelo | : |
| 320 | Kenneth Maloba | : |
| 321 | Kenneth Owino | : |
| 322 | Kimeu Nzioka Nganga | : |
| 323 | Kirumba W'mburu Mukuria | : |
| 324 | Laura Onono | : |
| 325 | Lawrence Ambrose Gitau | : |
| 326 | Leah Owino | : |
| 327 | Leilani Bower | : |
| 328 | Leonard Rajab Waithira | : |
| 329 | Leonard Shinenga | : |
| 330 | Leonidas Vrontamitis | : |
| 331 | Leslie Onono | : |
| 332 | Leslie Sambuli | : |
| 333 | Levina Minja | : |
| 334 | Levis Madahana Busera | : |
| 335 | Lewis Maloba | : |
| 336 | Lilian Kalio | : |
| 337 | Linda Oyanda | : |
| 338 | Livingstone Busera Madahana | : |
| 339 | Lloyd Wamai | : |
| 340 | Loise Kuya | : |
| 341 | Lorna Kung'u | : |
| 342 | Lucy Chege | : |
| 343 | Lucy Gitau | : |
| 344 | Lucy Grace Onono | : |
| 345 | Lucy Kambo | : |
| 346 | Lucy Kiongo | : |
| 347 | Lucy Mwangi | : |
| 348 | Lucy Nyawida Karigi | : |
| 349 | Lukas Kimeu | : |

| 350 | Lydia Bulimu | : |
| 351 | Lydia Gwaro | : |
| 352 | Lydia Muriki Mayaka | : |
| 353 | Lydia Ndivo Makau | : |
| 354 | Lydia Nyaboka Otao Okindo | : |
| 355 | Lynette Oyanda | : |
| 356 | Magdaline Owiti | : |
| 357 | Mahamud Omari Idi | : |
| 358 | Majdoline Abdallah | : |
| 359 | Manzi Musyoka | : |
| 360 | Margaret Gitau | : |
| 361 | Margaret Maloba | : |
| 362 | Margaret Murigi | : |
| 363 | Margaret Mwangi Ndibui | : |
| 364 | Margaret Njoki Ngugi | : |
| 365 | Margaret Nzomo | : |
| 366 | Margaret Tarimo | : |
| 367 | Margaret Waithira Ndungu | : |
| 368 | Marini Karima | : |
| 369 | Marita Onyango | : |
| 370 | Marlon Maloba | : |
| 371 | Martin Karigi | : |
| 372 | Mary Bulimu | : |
| 373 | Mary Gitonga | : |
| 374 | Mary Meresiana Paul | : |
| 375 | Mary Mudeche | : |
| 376 | Mary Muiriri | : |
| 377 | Mary Munguti | : |
| 378 | Mary Muthoni Ndungu | : |
| 379 | Mary Ndambuki | : |
| 380 | Mary Nzisiva Samuel | : |
| 381 | Caroline Maffry | : |

| | | |
|---|---|---|
| 382 | Mary Onsongo | : |
| 383 | Maryann Njoki Kiarie | : |
| 384 | Maureen Ndeda | : |
| 385 | Maurice Okatch Ogolla | : |
| 386 | Menelik Kwamia Makonnen | : |
| 387 | Merab Godia | : |
| 388 | Mercy Ndiritu | : |
| 389 | Mercy Wairumu Kamau | : |
| 390 | Mercy Wanjiru | : |
| 391 | Michael Ikonye Kiarie | : |
| 392 | Michael Kimeu | : |
| 393 | Michael Mwangi | : |
| 394 | Michael Ngigi Mworia | : |
| 395 | Michael Tsuma | : |
| 396 | Michael Ware | : |
| 397 | Milka Wangari Macharia | : |
| 398 | Millicent Bulimu | : |
| 399 | Milly Mikali Amduso | : |
| 400 | Mischeck Murigi | : |
| 401 | Misheck Mbogo | : |
| 402 | Mohamed Abdallah Mnyolya | : |
| 403 | Monica Wangari Munyori | : |
| 404 | Monicah Kamau | : |
| 405 | Monicah Opati | : |
| 406 | Mordechai Thomas Onono | : |
| 407 | Moses Kinyua | : |
| 408 | Muraba Chaka | : |
| 409 | Mwajabu Mahundi | : |
| 410 | Mwajumba Mahundi | : |
| 411 | Nafisa Malik | : |
| 412 | Nancy Macharia | : |
| 413 | Nancy Mbogo | : |

| 414 | Nancy Mimba Magak | : |
|---|---|---|
| 415 | Nephat Kimathi Mbogo | : |
| 416 | Newton Kamau | : |
| 417 | Ngugi Macharia | : |
| 418 | Nicholas Mutiso | : |
| 419 | Nickson Minja | : |
| 420 | Nigeel Namai | : |
| 421 | Norman Kagai | : |
| 422 | Nuri Hamisi Sultani | : |
| 423 | Nyangoro Mayaka | : |
| 424 | Omar Idi | : |
| 425 | Omar Zubari Omar | : |
| 426 | Onael Mdobilu | : |
| 427 | Pankaj Patel | : |
| 428 | Patrick Nyette | : |
| 429 | Patrick Okech | : |
| 430 | Paul Ngugi | : |
| 431 | Paul Onyango | : |
| 432 | Paul Vrontamitis | : |
| 433 | Pauline Abdallah | : |
| 434 | Pauline Adundo | : |
| 435 | Pauline Kamau | : |
| 436 | Pauline Kamau Kiongo | : |
| 437 | Peninah Mucii | : |
| 438 | Peris Gitumbu | : |
| 439 | Peris Onsongo | : |
| 440 | Peter Kamau | : |
| 441 | Peter Kamau Kiongo | : |
| 442 | Peter Kunigo | : |
| 443 | Peter Kuya | : |
| 444 | Peter Macharia | : |
| 445 | Peter Mdobilu | : |

| | | |
|---|---|---|
| 446 | Peter Mwaka | : |
| 447 | Peter Ngigi Mugo | : |
| 448 | Peter Ngugi | : |
| 449 | Petronila Munguti | : |
| 450 | Phaedra Vrontamitis | : |
| 451 | Phelister Okech | : |
| 452 | Philemon Oport | : |
| 453 | Phillip Kamau | : |
| 454 | Phoeba Ndegwa | : |
| 455 | Phoebe Kebungo | : |
| 456 | Pinina Onsongo | : |
| 457 | Polychep Odihambo | : |
| 458 | Prisca Owino | : |
| 459 | Priscila Okatch | : |
| 460 | Purity Mahonja | : |
| 461 | Rachael Mungasia Pussy | : |
| 462 | Rachel Oyanda Otieno | : |
| 463 | Rael Ochola | : |
| 464 | Rael Opati | : |
| 465 | Ramadhani Mahundi | : |
| 466 | Rammy Rotich | : |
| 467 | Raphael Kivindyo | : |
| 468 | Raphael Peter Munguti | : |
| 469 | Rashid Katimba | : |
| 470 | Rashid Omar Idi | : |
| 471 | Rehana Malik | : |
| 472 | Reuben Nyaga Mbogo | : |
| 473 | Rispah Abdallah | : |
| 474 | Rispah Auma | : |
| 475 | Rodgers Bulimu | : |
| 476 | Ronald Okelo | : |
| 477 | Rose Nyette | : |

| 478 | Roselyne Ndeda | : |
| 479 | Rosemary Anyango Okatch | : |
| 480 | Rosemary Olewe | : |
| 481 | Rukia Wanjiru Ali | : |
| 482 | Ruth Gatwiri Mwirigi | : |
| 483 | Ruth Lihanda | : |
| 484 | Ruth Maritim | : |
| 485 | Ruth Nduta Kamau | : |
| 486 | Said Mahundi | : |
| 487 | Sajjad Gulamaji | : |
| 488 | Salima Ismail Rajabu | : |
| 489 | Sally Cecilia Mamboleo | : |
| 490 | Sally Oport | : |
| 491 | Salome Onsongo | : |
| 492 | Salome Ratemo | : |
| 493 | Sammy Mwangi | : |
| 494 | Sammy Ndungu Kiarie | : |
| 495 | Sammy Okere | : |
| 496 | Samson Ogolla Okatch | : |
| 497 | Samuel Adundo | : |
| 498 | Samuel Mbugua Ndungu | : |
| 499 | Samuel Odhiambo Oriaro | : |
| 500 | Samuel Pussy | : |
| 501 | Sani Kwimbere | : |
| 502 | Sarah Mbogo | : |
| 503 | Sarah Tikolo | : |
| 504 | Sedrick Nair | : |
| 505 | Selifah Opati | : |
| 506 | Selina Boke | : |
| 507 | Shaban Mahundi | : |
| 508 | Sharon Maloba | : |
| 509 | Sharone Maritim | : |

| 510 | Sheila Maritim | : |
| 511 | Simon Ngure | : |
| 512 | Solomon Mbugua | : |
| 513 | Stacy Chaka | : |
| 514 | Stanley Chaka | : |
| 515 | Stanley Kinyua Macharia | : |
| 516 | Stanley Ngugi | : |
| 517 | Stanley Nyoike | : |
| 518 | Stella Mbugua | : |
| 519 | Stephen Muli | : |
| 520 | Stephen Njuki Mbogo | : |
| 521 | Stephen Onono | : |
| 522 | Steve Kihato | : |
| 523 | Steven Karigi | : |
| 524 | Steven Maloba | : |
| 525 | Susan Gitau | : |
| 526 | Syuindo Musyoka | : |
| 527 | Tabitha Kagai | : |
| 528 | Tabitha Kalio | : |
| 529 | Techonia Owiti | : |
| 530 | Theresa Adundo | : |
| 531 | Thomas Adundo | : |
| 532 | Tibruss Minja | : |
| 533 | Tilda Abur | : |
| 534 | Titus Kyalo Musyoka | : |
| 535 | Titus Wamai | : |
| 536 | Tobias Oyanda Otieno | : |
| 537 | Tony Kihato Irungu | : |
| 538 | Trusha Patel | : |
| 539 | Valentine Ndeda | : |
| 540 | Valerie Nair | : |
| 541 | Vallen Andeyo | : |

| 542 | Velma Bonyo | : |
| 543 | Vera Jean Oyanda | : |
| 544 | Victor Adeka | : |
| 545 | Victor Mpoto | : |
| 546 | Victor Watoro | : |
| 547 | Vincent Kamau Nyoike | : |
| 548 | Vincent Owuor | : |
| 549 | Violet Minja | : |
| 550 | Wallace Njorege Nyoike | : |
| 551 | Wambui Kung'u | : |
| 552 | Warren Owuor | : |
| 553 | Wellington Oluoma | : |
| 554 | Wendy Kagai | : |
| 555 | Wendy Olewe | : |
| 556 | William Maina | : |
| 557 | Winfred Wamai | : |
| 558 | Winnie Bonyo | : |
| 559 | Winnie Kimeu | : |
| 560 | Wycliffe Ochieng Bonyo | : |
| 561 | Wycliffe Okello Khabuchi | : |
| 562 | Yusuph Mahundi | : |
| 563 | Yvonne Bochart | : |
| 564 | Yvonne Oport | : |
| 565 | Zackaria Musalia Atinga | : |
| 566 | Zakayo Matiko | : |
| 567 | Zephania Mboge | : |

Plaintiffs,

v.

CLEARSTREAM   BANKING   S.A.,   a
Luxembourg Banking Corporation

BANCA UBAE, SpA, an Italian Banking
Corporation

JP MORGAN  CHASE BANK, N.A., a
United States Banking Association;

CENTRAL BANK OF IRAN, a/k/a Bank
Markazi; and the ISLAMIC REPUBLIC
OF IRAN.

                Defendants.

## COMPLAINT

Plaintiffs, judgment creditors of the Islamic Republic of Iran and the Iranian Ministry of Information and Security ("Plaintiffs") through undersigned counsel, respectfully bring this action against Clearstream Banking, S.A., Banca UBAE, SpA, JP Morgan Chase Bank, N.A., Central Bank of Iran a/k/a Bank Markazi, and the Islamic Republic of Iran and allege as follows:

## PRELIMINARY STATEMENT

1.      In August 2008, victims of the 1998 East African Embassy terrorist attacks and their immediate family members filed lawsuits against the Islamic Republic of Iran ("Iran"), Iranian Ministry of Information and Security ('MOIS"), and the Republic of Sudan under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, seeking damages as a result of Iran and Sudan's material support of Al Qaeda which directly resulted in the 1998 East African Embassy terrorist attacks that occurred in Kenya and Tanzania.

2.      On November 28, 2011, following a three-day bench trial, the United States District Court for the District of Columbia entered final judgment on liability in favor of the victims of Plaintiffs.

3.      On July 25, 2014, Judge Bates ordered that Final Judgment be entered in favor of the Plaintiffs for their injuries and damages caused by the Government of Sudan and others who were responsible for supporting, funding, and otherwise carrying out" the bombings in Nairobi and Dar es

Salaam.  Judge Bates ordered entry of Final Judgment for the 567 Plaintiffs in a total amount of $8,684,523,372.  Of that damages award, $4,342,261,686 constituted compensatory damages or damages to compensate the Plaintiffs for their injuries, and $4,342,261,686 constituted punitive damages to deter the Government of Sudan and others from engaging, participating, and facilitating acts of international terrorism.

4.     On July 28, 2014, the Final Judgments were certified in the District of Columbia and then also registered in the Southern District of New York.  Thus, Plaintiffs are judgment creditors of the Government of Sudan and others as a result of the Final Award of Judgment and Damages entered by Judge Bates on July 25, 2014 in the United States District Court for the District of Columbia.

5.     Aware of the billions of dollars in judgments belonging to various Iranian judgment creditors against Iran and its agencies and instrumentalities, Defendants Islamic Republic of Iran; Bank Markazi; the Central Bank of Iran; Clearstream Banking S.A.; and Banca UBAE, SpA entered into a conspiracy with the actual intent to hinder, delay, and defraud Plaintiffs and other Iranian judgment creditors by attempting to conceal Markazi's, and therefore Iran's, interest in securities entitlements relating to certain global bonds and then claim the financial assets cannot be attached because they are outside the jurisdiction of United States Courts.

6.     As a result of that knowing and intentional, fraudulent conduct, this Complaint seeks to (i) set aside the fraudulent transfers, and (ii) turn those fraudulently transferred assets over to Plaintiffs.

7.     This Complaint also seeks a declaration that (i) certain fraudulent transfers undertaken in October 2012 violated Executive Order 13559, (ii) the financial assets fraudulently transferred must be unwound pursuant to 31 C.F.R. 560.211-212, and (iii) the financial assets must be turned over to the Plaintiffs.

## PARTIES

8.      Lead plaintiff Mary Ofisi was an employee of the United States Government and was severely injured in the August 1998 terrorist attack on the United States Embassy in Nairobi, Kenya. Mrs. Ofisi in a Kenyan national who worked 24 years for the U.S. Government before retiring on May 3, 2013.  She was working at the time of the August 1998 attack as a voucher examiner in the Finance Department at the U.S. Embassy in Kenya.  She suffered severe injuries, including to her eyes which required multiple surgeries immediately following the attack and in 1999, as well as emotional distress from witnessing the brutal murder of her colleagues and close friends.  Mrs. Ofisi is a judgment creditor of Sudan.

9.      Each of the other named plaintiffs are either United States citizens or foreign national employees or contractors of the United States Government who were killed or injured in the 1998 East African Embassy Attacks, or their immediate family members

10.     On July 25, 2014, Plaintiffs obtained a Final Judgment against Sudan for their injuries and damages caused by that Government and others who were responsible for supporting, funding, and otherwise carrying out the 1998 East African Embassy Attacks.  Plaintiffs were awarded compensatory damages and punitive damages to deter the Sudan and others from engaging, participating in, and facilitating acts of international terrorism.

11.     Defendant Clearstream Banking S.A. ("Clearstream") is a banking corporation organized under the laws of the Grand Duchy of Luxembourg. Clearstream provides international financial services for the financial industry, including securities settlement and custody-safe keeping services. Clearstream maintains its main office at 42 Avenue John F. Kennedy, L-1855 Luxembourg, Luxembourg. Clearstream maintains a New York Representative Office at 60 Broad Street, 31st Floor, New York, New York 10004.

12.     Defendant UBAE, SpA ("UBAE"), is a banking corporation organized under the laws

of Italy. UBAE maintains its principal office in Rome, Italy.

13.     Defendant JPMorgan Chase Bank, N.A. ("JPMorgan") is a banking association organized under the laws of the United States. JPMorgan maintains its principal office at 270 Park Avenue, New York, New York. JPMorgan maintains a correspondent account for and in the name of Clearstream at 4 New York Plaza, 15th Floor, New York, New York 10004.

14.     Defendant Islamic Republic of Iran ("Iran") is a judgment debtor pursuant to the Levin Judgment. Iran is a foreign sovereign and has been a U.S. government-designated state sponsor of terrorism every year since 1984. Accordingly, Iran is not immune from suit or execution in connection with its support for international acts of terrorism.

15.     Defendant, Central Bank of Iran, a/k/a Bank Markazi, ("Markazi") is the Central Bank of Iran. Markazi is an agent, instrumentality, and alter ego of Iran. Markazi engaged in the conduct described in this Complaint at the direction and for the benefit of Iran. Iran directed Markazi to engage in the conduct and supervised Markazi's performance. On November 25, 2011, the U.S. Department of the Treasury issued a Notice of finding that Iran is a "jurisdiction of primary money laundering concern" as a result of its illegal and deceptive efforts to facilitate Iran's support for global terrorism and its pursuit of weapons of mass destruction, including nuclear and ballistic missile capabilities.[1]

16.     The Department of Treasury further found that Markazi, among other state- owned Iranian banks, "willingly engage[s] in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine efforts of responsible regulatory agencies."[2]

17.     In addition, Iran has failed to comport with the strict anti-money laundering and counter-terrorism financing controls in place worldwide, and has failed to comply with the Basal III

---

[1] https://www.federalregister.gov/documents/2011/11/25/2011-30332/finding-that-the-islamic-republic- of-iran-is-a-jurisdiction-of-primary-money-laundering-concern
[2] *Id.*

standards which govern risk management, corporate governance, bankruptcy laws, and other bank safety requirements.

18.     Markazi is an agency or instrumentality of Iran and is, as a result, an alter ego of Iran. Iran controls Markazi to such an extent that Markazi maintains no independence or free will. The U.S. Department of Treasury recognizes Markazi's status as Iran's alter ego in § 535.433 of the U.S. Iranian Assets Control Regulations, which state, "The Central Bank of Iran (Bank Markazi Iran) is an agency, instrumentality and controlled entity of the government of Iran for all purposes under this part [i.e., 31 C.P.R. Part 535]." Accordingly, for purposes of this Complaint, the term "Markazi" will refer to Iran and Markazi collectively.

## SUBJECT MATTER JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises out of the laws of the United States, specifically the International Emergency Powers Act, 50 U.S.C. § 1701 *et seq.*, Executive Order 13599 of February 5, 2012, issued by President Obama, Exec. Order 77 Fed. Reg. 6659 (Feb. 8, 2012), and the regulations promulgated thereunder by the Office of Foreign Assets Control, of the U.S. Department of the Treasury ("OFAC") at 31 C.F.R. §§ 560.211 and 560.212.

20.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1605(a)(1), 1605(a)(2), 1605(a)(7), 1605A, 1610(a) and (g), and TRIA because this action seeks to enforce a judgment arising from violations of 18 U.S.C. § 1605A(a)(1).

21.     This Court has subject matter jurisdiction over the Plaintiffs' request for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57, declaring void (i) certain transfers of securities entitlements in various bonds from Markazi's account at Clearstream to a different account opened in the name of UBAE, for the sole benefit of Markazi, at Clearstream; (ii) certain financial transfers of interest and principal payments relating to

those bonds from a Clearstream account at JPMorgan in New York to the UBAE account opened and/or a segregated, blocked account at Clearstream in Luxembourg, (iii) certain financial transfers in October 2012 of additional interest and principal payments relating to those same bonds in violation of Executive Order 13599 from Clearstream's account at JPMorgan in New York to the UBAE account opened and/or a segregated, blocked account at Clearstream in Luxembourg, in violation of state and federal law.

22.     This Court has supplemental, or ancillary, enforcement jurisdiction over this cause of action pursuant to 28 U.S.C. §1367, because this suit is brought to enforce an unsatisfied judgment.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

### PERSONAL JURISDICTION

**A.     Clearstream Is Subject to Personal Jurisdiction**

24.     This Court has specific personal jurisdiction over Clearstream pursuant to CPLR § 302(a)(1)-(3), the New York long-arm statute.

25.     Clearstream is subject to personal jurisdiction in this district pursuant to CPLR 302(a)(1) because it transacts business in the State of New York within the meaning of CLPR 302(a)(1) and because the Plaintiffs' claims arise from specific business transactions that Clearstream conducted in the State.

a.     Clearstream is registered to do business in the State of New York and is also registered with the New York State Department of Financial Services to operate a representative banking office in New York.

b.     Clearstream operates a representative office in the district, from which it conducts business in New York and services its clients' needs. Clearstream uses its New York office to engage in and support the sales, marketing, and administration of its international financial services business.

c.   Clearstream uses its New York office as an extension of its Luxembourg- based financial operations, to seek additional business for its international financial services business, and to ensure seamless service to its clients by maintaining points of contact in the United States banking and financial markets.

d.   Clearstream employs New York-based individuals and provides those employees with access to resources and facilities that enable them to provide sales, marketing, and administrative services to Clearstream's international financial services operations. The facilities and resources include office space in New York, telephones, email access and email addresses, and fax lines.

e.   Clearstream pays its New York-based employees out of bank accounts maintained in New York;

f.   Clearstream maintains, among other accounts in New York, a bank account within this district with JPMorgan ("NY JPMorgan Account"). For more than twenty-five years, Clearstream has conducted its business and serviced its clients' needs through the NY JPMorgan Account.

g.   Clearstream sends and receives hundreds of transactions, totaling billions of dollars, through the NY JPMorgan Account each day. The transactions often involve the deposit and transfer of bond-related payments.

h.   The Plaintiffs' claims, as more particularly described below, arise from business transactions Clearstream conducted on behalf of Markazi using the NY JPMorgan Account between 2008 and 2012. During that time period, Clearstream received into the NY JPMorgan Account more than $1.68 billion in bond proceeds in which Markazi held a beneficial interest and subsequently transferred the assets outside the jurisdiction of the United States. Clearstream acts as an agency and instrumentality of

Iran and Markazi in New York.

26.     Clearstream is also subject to personal jurisdiction in this district pursuant to CLPR § 302(a)(2) because it committed a tortious act in the State of New York when, as more particularly described below, it entered into, and purposefully acted in furtherance of, a conspiracy with Markazi and UBAE to facilitate Markazi's effort to fraudulently hinder, delay, and defraud Iran's judgment creditors, including the Plaintiffs, and to unlawfully help Iran and Markazi evade sanctions imposed by the United States, the European Union, and other international sanctions.

27.     Clearstream knowingly and intentionally helped Markazi conceal its ownership of approximately $4.6 billion in securities that were being processed by banks in New York and then transfer outside the United States jurisdiction more than $1.5 billion in Markazi funds relating to those securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi. Clearstream is also subject to personal jurisdiction in this district pursuant to CLPR § 302(a)(3) to the extent it committed a tortious act outside the State of New York knowing that it would cause injury within the State of New York.

28.     As more particularly described below, Clearstream entered into, and purposefully acted in furtherance of, a conspiracy with Markazi and UBAE to help Markazi's effort to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Plaintiffs, and to unlawfully help Iran and Markazi evade sanctions imposed by the United States, the European Union, and other  international sanctions. Among other things, Clearstream knowingly and intentionally helped Markazi conceal its ownership of approximately $4.6 billion in securities that were being processed by banks in New York and then transfer outside the United States jurisdiction more than $1.5 billion in Markazi funds relating to those securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi.

29.     In addition to specific personal jurisdiction over Clearstream pursuant to CPLR

302(a)(1)-(3), this Court has personal jurisdiction over Clearstream pursuant to Fed. R. Civ. P. 4(k)(2) because the Plaintiffs' claims arise under federal law and exercising jurisdiction over Clearstream based on the conduct described in this Complaint is consistent with the United States Constitution and laws.

### B.    UBAE Is Subject to Personal Jurisdiction

30.    This Court has specific personal jurisdiction over UBAE pursuant to CLPR 302(a)(3) because it committed a tortious act outside the State of New York that caused injury within the State of New York. As more particularly described below, it knowingly and intentionally entered into, and purposefully took actions in furtherance of, a conspiracy with Markazi and Clearstream to help Markazi hinder, delay, and defraud Iran's judgment creditors, including the Plaintiffs, to prevent them from enforcing their judgments and to unlawfully help Iran and Markazi evade sanctions imposed by the United States, the European Union, and other international sanctions. Among other things, UBAE knowingly and intentionally helped Markazi and Clearstream conceal Markazi's ownership of approximately $4.6 billion in securities that were being processed by banks in New York and then transfer outside the United States jurisdiction more than $1.5 billion in Markazi funds relating to those securities entitlements that were subject to attachment and execution by judgment creditors of Iran and Markazi. UBAE joined the conspiracy and helped further the conspiracy's goals knowing that the conspiracy would cause harm to the Plaintiffs in New York. In addition to specific personal jurisdiction over UBAE pursuant to CPLR 302(a)(3), this Court has personal jurisdiction over UBAE pursuant to Fed. R. Civ. P. 4(k)(2) because the Plaintiffs' claims arise under federal law and exercising jurisdiction over UBAE based on the conduct described in this Complaint is consistent with the United States Constitution and laws.

### C.    JPMorgan Is Subject to Personal Jurisdiction

31.    This Court has general personal jurisdiction over JPMorgan because its principal

place of business is in New York, New York.

## FACTUAL BACKGROUND

A.   **Iran Has Been Designated a State Sponsor of Terrorism by the United States and Has Been Sanctioned by the European Union for Its Participation in Acts of International of Terrorism**

32.      Iran has been using acts of international terrorism to wage an undeclared, surreptitious war against the United States and Israel for more than thirty (30) years. Iran wages this undeclared war through asymmetrical, or unconventional, strategies and terrorism, often through proxies such as Hezbollah, Hamas, al-Qaeda and others. Iran provides extensive funding, training, and weaponry to its proxies for the purpose of promoting, facilitating, and carrying out violent and deadly acts of international terrorism. As part of its strategy, Iran has been actively seeking to acquire or develop nuclear weapons.

33.      The Secretary of State officially designated Iran as a state sponsor of terrorism on January 19, 1984. State sponsors of terrorism are countries the United States has found to have repeatedly provided support for acts of international terrorism. The Secretary of State has renewed Iran's designation as a state sponsor of terrorism every year since 1984. Iran is currently still designated a state sponsor of terrorism.

34.      The European Union has also condemned Iran's history of participating in, and supporting, acts of international terrorism. As a consequence, the European Union has implemented a variety of sanctions against Iran with the purpose of dissuading it from participating in or supporting international terrorism.

35.      In addition to the United States and the European Union, the governments of almost every country in the world condemn Iran's participation in, and support for, acts of international terrorism.

36.      At all times relevant to the allegations of this Complaint, the Defendants had actual

knowledge that Iran participated in, supported, and facilitated violent and deadly acts of international terrorism. Defendants gained their knowledge about Iran's participation in, and support for, international terrorism in many ways. Among others, the Defendants learned about Iran's support for international terrorism through widespread news reporting in almost every country of the world, including the news media in countries were Defendants do business.

**A.** **The United States and the European Union Have Imposed a Series of Ever Increasing Economic Sanctions Against Iran**

37.     In addition to designating Iran a state sponsor of terrorism, the United States has attempted to prevent Iran from continuing its support of acts of international terrorism and from pursuing nuclear weapons by imposing increasingly severe economic sanctions against it. Among other sanctions, the United States imposed the following:

a. On November 14, 1979, the United States blocked all property of Iran, including Markazi, in the United States in response to the hostage crisis. Executive Order 12170, 44 Fed. Reg. 65729 (Nov. 14, 1979). Though disputes relating to the blocked assets have been, and continue to be, resolved through a dispute resolution process known as the Algiers Accords, Executive Order 12170 remains in effect.

b. On March 15, 1995, the United States prohibited United States persons from directly or indirectly developing or financing the development of petroleum resources inside Iran. Executive Order 12957, 60 Fed. Reg. 12957 (Mar. 15, 1995). Executive Order 12957 remains in effect.

c. On May 6, 1995, the United States prohibited trade with and investment in Iran. Executive Order 12959, 60 Fed. Reg. 24757 (May 6, 1995).

d. On May 22, 2006, the United States Treasury Department amended the Iranian Transaction Regulation, 31 C.F.R. Part 560, to increase civil and criminal penalties for

violation trade sanctions against Iran. Amendment of Iranian Transactions Regulations, 31 CFR part 560, 71 Fed. Reg. 29251 (2006)

e. On September 12, 2006, the United States Treasury Department amended the Iranian Transaction Regulations, 31 C.F.R. Part 560, to cut off Bank Saderat, a major Iranian bank, and various of its subsidiary banks from the U.S. financial system because it was a significant facilitator of Hezbollah's financial activities and has served as a conduit between the Government of Iran and Hezbollah, Hamas, the Popular Front for the Liberation of Palestine- General Command, and Palestinian Islamic Jihad. Amendment of Iranian Transactions Regulations, 31 CFR part 560, 71 Fed. Reg. 53569 (2006). On January 7, 2007, the United States Treasury Department placed Bank Sepah, an Iranian state-run bank, on its Specially Designated Nationals List for helping Iran in developing missiles that could carry nuclear weapons. As a result of the designation, all of Bank Sepah's branches and subsidiaries in Italy, UK, France, and Germany were to have their assets frozen by the United States. Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 7919 (2007);

f. On October 25, 2007, the United States Treasury Department imposed sanctions on Bank Melli, including various subsidiary banks, because it provided financial services to Iran's nuclear and ballistic missile programs and also sent at least $100 million to Hamas, Palestinian Islamic Jihad, Hezbollah, and other terrorist groups from 2002 to 2006. Among other things, Bank Melli employed deceptive banking practices to obscure its involvement from the international banking system. Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 62520 (2007); Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism, October 25, 2007, https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

g. By the end of 2007, the United States Treasury Department had sanction- designated

eleven Iranian banks, including state-owned banks. Fact Sheet: Overview of Iranian-Linked Financial Institutions Designated by The United States, https://www.treasury.gov/press-center/press-releases/Documents/012312_Fact_Sheet_Designated_Iranian_Financial%20Institutions.pdf.

38.     As a result of the Sanctions, the United States imposed greater obligations on banking and financial institutions to forebear from engaging in or facilitating transactions involving Iran or Iranian counterparties.

39.     Like the United States, the European Union has also attempted to prevent Iran from continuing its support acts of international terrorism and from pursing nuclear weapons by imposing its own set of increasingly severe economic sanctions against Iran. Among other sanctions, the European Union has imposed the following:

a.  On April 19, 2007, the European Union prohibited any individual or entity from engaging in the sale of goods or technology that could contribute to Iran's enrichment-related, reprocessing, or heavy water-related activities, or to the development of nuclear weapon delivery systems. Regulation (EC) No. 423/2007, promulgated April 19, 2007.

b.  On July 26, 2010, the European Union again expanded the sanctions imposed by Regulation (EC) No. 423/2007 to restrict (i) trade in dual-use goods and technology, as well as equipment which might be used for internal repression, (ii) trade in key equipment and technology for, and restrictions on investment in the Iranian oil and gas industry, (iii) restrict investments in the uranium mining and nuclear industry, (iv) restrict transfers of funds to and from Iran, (v) restrict transactions involving the Iranian banking sector, (vi) restrict Iran's access to the insurance and bonds markets of the Union, and (vii) restrict transactions relating to services involving Iranian ships and cargo aircraft. Decision 2010/413/CFSP, dated July 26, 2010.

c.  On October 25, 2010, the European Union again expanded economic sanctions against Iran. Among other things, the European Union restricted financial transactions with Iranian individuals and entities, prohibited the purchase or sale of public-guaranteed bonds to or from Iranian individuals and entities, prohibited the provision of brokerage services to Iran or Iranian individual and entities relating to public-guaranteed bonds. Regulation (EU) No 961/2010, dated October 25, 2010.

d.  On January 23, 2012, the European Union expanded the sanctions to (i) prohibit trade in dual-use goods and technology, as well as on key equipment and technology which could be used in the petrochemical industry; (ii) ban the import of Iranian crude oil, petroleum products, and petrochemical products, as well as a prohibition of investment in the petrochemical industry; (iii) prohibit trade in gold, precious metals, and diamonds with the Government of Iran; and (iv) prohibit the delivery of newly printed banknotes and coinage to or for the benefit of the Central Bank of Iran. Decision 2012/35/CFSP, dated January 23, 2012. In particular, the European Union froze all assets belonging to Markazi. *Id*.

e.  On March 23, 2012, the European Union significantly expanded the economic sanctions against Iran to include a broader array of goods, services, technology, and financial support.  In particular, the European Union precluded transferring any funds, securities, or other financial instruments to or from Iran or any Iranian person or entity and purchasing or selling bonds from or to Iran or any Iranian person or entity. Regulation (EU) 267/2012, dated March 23, 2012.

40.    The United States and European Union sanctions imposed compliance obligations on Defendants. As financial institutions operating in the world marketplace, Defendants were notified of, and obligated to comply with, the sanctions. Therefore, Defendants had actual knowledge of the

sanctions and their obligations to comply with them. To ensure compliance, Defendants implemented internal procedures and systems to monitor financial transactions conducted through their respective banking systems.

> **B.     United States Courts Have Repeatedly Held Iran Civilly Liable for Supporting Acts of International Terrorism and Authorized Judgment Creditors to Execute on Iranian Assets in the United States**

41.     United States courts have also repeatedly found Iran civilly liable for supporting and facilitating acts of international terrorism that resulted in the death and injury of thousands of United States citizens and employees of the United States government. In addition to Plaintiffs judgments arising out of the 1998 U.S. Embassy bombings, judgment has been entered against Iran and its various political subdivisions, and agencies and instrumentalities, over seventy times for its role in the violent and deadly acts of international terrorism such as the 1983 suicide bombing of the U.S. Marine Barracks in Beirut, the 1983 and 1984 bombings of the U.S. Embassy and Embassy Annex in Beirut, t the 1996 bombing of Khobar Towers in Saudi Arabia, which housed U.S. Air Force personnel, the terrorist attacks of September 11, 2001, and numerous kidnappings, hijackings, assassinations, and suicide bombings both here in the United States and abroad.

42.     The compensatory damages amounts entered against Iran for its terrorist acts currently exceed $25 billion in the aggregate.

43.     The Defendants were aware of the judgments against Iran and knew that victims of Iranian-supported acts of international terrorism were actively seeking to enforce their judgments against Iranian assets in the United States.

44.     Clearstream, in particular, had direct knowledge that terrorism victims were seeking to enforce judgments against Iranian assets in the United States. On June 13, 2008, Citibank in New York City was served with a writ of execution by plaintiffs in *Peterson, et al. v. Islamic Republic of Iran, et al.*, No. 10 Civ. 4518 (KBF) (S.D.N.Y.) ("Peterson Plaintiffs"), compelling Citibank to

turnover what amounted to almost $2 billion in Iranian assets held by Clearstream in a Citibank account. Congress Enhances and Expands the Ability of Terrorism Victims to Enforce Their Judgments against Iranian Assets

45.     In September 2007, Congress began considering amendments to the FSIA that would enhance and expand the ability of victims of terrorism to collect judgments against state sponsors of terrorism, like Iran ("FSIA Amendments"). Senate Amendment; H.R. 1585, 110th Cong., 1st Sess., § 1087, *et. seq.*, 2007 HR Cong US 1585 (Oct. 1, 2007).

46.     The FSIA Amendments were intended, among other things, to permit judgment creditors of Iran to levy assets belonging to any of Iran's political subdivisions, agencies, or instrumentalities – including Markazi – regardless whether the judgment creditors had judgments specifically against any of those juridical entities.

47.     The FSIA Amendments received wide-spread attention in the world-wide news media.

48.     Iran, Markazi, and their counsel were closely following the FSIA Amendment process in Congress and were aware of the impact the FSIA Amendments would have on their ability to hide Iran's assets from existing and future judgment creditors. Iran has long sought to protect its assets from efforts by victims of its acts of terrorism to collect on the substantial judgments against it and its political subdivisions, agencies, and instrumentalities. Iran has attempted to evade collection efforts by maneuvering its assets outside the reach of United States' judgment creditors. Iran and Markazi recognized that the FSIA Amendments would place at risk assets they had previously thought to be outside the reach of judgment creditors.

49.     The FSIA Amendments became law on January 28, 2008, were enacted as 28 U.S.C. § 1605A, and were incorporated into 28 U.S.C. § 1610. National Defense Authorization Act for 2008, Pub.L.No. 110-181, § 1083, 122 Stat. 3.

34

**F.      The United States Government Warns Clearstream About Doing Business with Iran and Markazi**

50.      During the same period of time Congress was considering the FSIA Amendments, the United States Department of Treasury, Office of Foreign Asset Control ("OFAC")[3] began to investigate Clearstream's business dealings with Iran and Markazi. Among other things, OFAC met with Clearstream to (a) discuss United States sanctions regimes restricting economic activity with Iran, including the Iranian Transactions Regulations, 31 C.F.R. § 560.101, et seq. (2008) ("ITR"); (b) place Clearstream on notice of its apparent violations of those regulations through its ongoing business dealings with, and provision of financial services to, Iran and Markazi; and OFAC administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others. OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction. (c) warn Clearstream about the consequences of continuing to violate U.S. sanctions laws in connection with its Iranian business dealings ("OFAC Inquiry").

51.      As a result of the OFAC Inquiry, Clearstream represented to OFAC in December 2007 that it would terminate its business dealings with Iranian clients.

52.      However, contrary to its representations to OFAC, Clearstream did notterminate its business dealings with Markazi.

---

[3] OFAC administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others.  OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. Jurisdiction

### G.    Markazi and Clearstream Enter into a Conspiracy to Conceal U.S. Dollar-Denominated Assets from Iran's Judgment Creditors and from the United States Government

53.    Instead of terminating its business relationship with Iran and Markazi, Clearstream entered into a conspiracy with Markazi to (i) conceal Markazi's assets from the United States Government, from the Plaintiffs, and from other judgment creditors of Iran, and (ii) try to place Markazi's assets outside the reach of United States courts where Iran's and Markazi's judgment creditors were seeking to enforce their judgments (the "Conspiracy").

54.    Clearstream and Markazi entered into the Conspiracy with full knowledge that (i) Iran was a designated state sponsor of terrorism; (ii) financial transactions involving Iran were severely restricted, and often prohibited, by U.S., European Union, and other international economic sanctions; (iii) OFAC was investigating Clearstream specifically for violating U.S. sanctions law in connection with its business dealings with Iran and Markazi; (iv) the FSIA Amendments were about to become law and would expose Markazi's assets in the United States to judgment creditors; (v) the Plaintiffs held a judgment against Iran; (vi) other Plaintiffs were proceeding to judgment against Iran; (vii) existing judgment creditors were actively seeking to enforce their judgments against Iranian assets; and (viii) many additional victims of Iran- sponsored acts of international terrorism were filing complaints and obtaining judgments against Iran.

55.    Clearstream, Iran, and Markazi, entered into the Conspiracy with the specific intent to (i) conceal Iran's and Markazi's assets from the United States government, (ii) enable Iran and Markazi to continue investing through Clearstream in bonds denominated in U.S. dollars while simultaneously enabling Clearstream to represent to the United Statesgovernment that it no longer provided services to Iran or Markazi, and (iii) hinder, delay, and defraud Iran's creditors, including the Plaintiffs who had filed suit against Iran and who were, at that time proceeding to judgment, and now hold a judgment against Iran and its agencies and instrumentalities.

56.　　Clearstream has long assisted Iran and Markazi to launder U.S. dollar("USD") assets through the American financial system.

57.　　The panoply of international economic sanctions caused Iran and Markazi to rely heavily on a small group of financial institutions to assist them in laundering money and in conducting the financial activity relating to Iran's substantial international sales of oil. The same financial network conducts money laundering activities that support Iran's international terrorism and its attempts to acquire and develop weapons of mass destruction, including nuclear weapons.

58.　　Clearstream's loyalty to Iran in the face of mounting international sanctions allowed it to develop a significant business relationship with Iran and Markazi. Between the early 1996 and 2008, Markazi substantially increased its business with Clearstream.

59.　　In late 2007 and early 2008, Markazi held, among other assets invested with Clearstream, beneficial interests in at least two sets of U.S. dollar-denominated sovereign and corporate bonds.

## 1.　　Markazi's Citibank Bonds

60.　　Markazi owned securities entitlements recorded as book entries in Clearstream Luxembourg in connection with certain corporate and sovereign bonds held in the United States ("Citibank Bonds").

61.　　Central securities depositories in the United States served as the ultimate place of safekeeping for the Citibank Bonds. Issuers of the Citibank Bonds deposited interest and principle payments relating to those bonds into a bank account Clearstream maintained at Citibank in New York City ("Citibank Account"). Markazi's securities entitlements in the Citibank Bonds had an aggregate, nominal value of approximately $2.813 billion.

62.　　By virtue of its securities entitlements, Markazi had a beneficial interest in the Citibank Bonds, together with the principal and interest deposited into the Citibank Account.

63.     The deposits of principal and interest into the Citibank Account relating to the Citibank Bonds were a financial asset owned by Markazi by virtue of its security entitlements in the Citibank Bonds.

64.     Clearstream acted as the securities intermediary for Markazi in connection with the Citibank Bonds. In that capacity, Clearstream provided custody and related financial services from the United States to Markazi. In furtherance of the Conspiracy, Clearstream enabled Markazi to hold interests in the Citibank Bonds, as well as the principle and interest deposited into the Citibank Account, and provided means to enable Iran and Markazi to conceal Markazi's interest in the Citibank Bonds from Iran's judgment creditors and from the United States government.

### 2.  Markazi's JPMorgan Bonds

65.     Markazi also owned securities entitlements in connection with certain otherbonds issued by foreign entities ("JPMorgan Bonds"). The JPMorgan Bonds were issued by non-U.S. sovereigns or "supranationals" like the European Investment Bank.

66.     Each JPMorgan Bond was issued in either the physical form of one or more global notes or in a dematerialized form that was registered and deposited with a foreign affiliate ofa United States bank, acting as depository or sub-depository for Clearstream, who acted as depository.

67.     Markazi's ownership in JPMorgan Bonds was recorded as book entries in Clearstream Luxembourg.

68.     Issuers of the JPMorgan Bonds deposited interest and principle payments relating to those bonds into a bank account maintained by Clearstream at JPMorgan in New York City ("JPMorgan Account").

69.     The deposits of principal and interest payments relating to the JPMorgan Bonds into the JPMorgan Account were a financial asset owned by Markazi by virtue of its security entitlements in the JPMorgan Bonds. Therefore, Markazi had a beneficial interest in the JPMorgan Bonds,

together with the related principal and interest payments deposited into Clearstream's JPMorgan Account.

70.     A prospectus for a bond issued by the United Kingdom, bearing International Securities Identification Number XS0171740961 is an exemplar of the language creating Markazi's beneficial interest in the JPMorgan Bonds. It states in relevant part:

> Ownership of beneficial interests in the Global Notes will be limited to persons that have accounts with Euroclear, Clearstream, Luxembourg, or DTC or persons that may hold interests through such accountholders. Beneficial interests in the Global Notes will be shown on, and transfers thereof will be effected only through, records maintained in book entry form by Euroclear, Clearstream, Luxembourg or DTC and their account holders, as applicable.
>
> * * *
>
> Payments shall be made in U.S. dollars by cheque drawn on a bank in New York City and mailed to the account holder (or to the first named of joint holders) of such Notes at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar before the Record Date, such payment may be made by transfer to a U.S. dollar accounted maintained by the payee with a bank in New York City.
>
> * * *
>
> Each of the persons shown in the records of Euroclear, Clearstream, Luxembourg or DEC as holders of a Note represented by a Global Note must look solely to Euroclear, Clearstream, Luxembourg, or DCT (as the case may be) for his share of each payment made by H.M. Treasury to the holder of such Global Note and in relation to all other rights arising under the Global Note, subject to and in accordance with the respective rules and procedures of Euroclear, Clearstream, Luxembourg or DTC (as the case may be).

71.     Clearstream acted as the securities intermediary for Markazi in connection with the JPMorgan Bonds. In that capacity, Clearstream provided financial services in the United States to Markazi in connection with the JPMorgan Bonds. Clearstream's role as securities intermediary enabled Markazi to hold interests in the JPMorgan Bonds, as well as the principle and interest deposited into Clearstream's JPMorgan Account, and, in furtherance of the Conspiracy, also provided

means to enable Iran and Markazi to conceal Markazi's interest in the JPMorgan Bonds from Iran's judgment creditors and from the United States government.

**I.      Markazi, Clearstream, and UBAE Attempt to Hinder, Delay, and Defraud Iran's Judgment Creditors**

72.      In furtherance of the Conspiracy to place Iran's and Markazi's financial assets, including the Citibank Bonds and the JPMorgan Bonds, beyond the reach of United States judgment creditors and conceal them from both judgment creditors and the United States government, Markazi and Clearstream enlisted UBAE as a co-conspirator.

73.      UBAE is a small bank that was, at the time, controlled by the regime of Libyan dictator Muammar Gaddafi. UBAE agreed to participate in the Conspiracy by, among other things, holding the assets that Iran and Markazi had invested with Clearstream in accounts opened in UBAE's name, but created solely for the benefit of Iran and Markazi.

74.      Other than surreptitiously holding Markazi's assets, UBAE served no financial or business purpose and UBAE provided no additional financial services to Markazi. Markazi would have continued to conduct transactions relating to the Citibank Bonds and JPMorgan Bonds in its own Clearstream account but for the fear that the financial assets would be subject to seizure if Markazi continued to own the bonds directly.

75.      Markazi agreed to pay UBAE substantial fees as compensation for serving as Markazi's undisclosed agent in connection with the Citibank Bonds and the JPMorgan Bonds.

76.      As a result, UBAE joined the Conspiracy.

77.      At the time, it joined the Conspiracy, UBAE knew the goals of the Conspiracy and joined it for the express purpose of helping Markazi and Clearstream to accomplish the goals of the Conspiracy. UBAE also joined the Conspiracy knowing and intended that Iran's and Markazi's judgment creditors would be harmed in New York.

78.     On January 17, 2008, only days before the FSIA Amendments become law and less than one month after Clearstream fraudulently represented to OFAC that it was terminating all business relationships with Iran and Markazi, Markazi opened an account with UBAE. The account was opened in furtherance of the Conspiracy and for the specific purpose of acting as Markazi's custodial account in connection with Markazi's securities positions at Clearstream.

79.     On January 18, 2008, the day after Markazi opened an account at UBAE, UBAE opened Account No. 13061 at Clearstream Luxembourg. During the preceding 25 years, UBAE had maintained only one account at Clearstream. Account 13061 was opened in UBAE's name in furtherance of the Conspiracy. Markazi, Clearstream, and UBAE agreed that Iran and Markazi would be the sole beneficial owners of any financial assets deposited into Account No. 13061.

80.     In furtherance of the Conspiracy, Markazi instructed Clearstream to transfer $4.6 billion in securities from its account at Clearstream to Account 13061 ("2008 Fraudulent Transfers"). Markazi's securities entitlements in the Citibank Bonds and the JPMorgan Bonds were among the financial assets transferred to Account 13061. The securities were transferred "free of payment," meaning that there was no exchange of cash or other payment from UBAE to Markazi within Clearstream's settlement system.

81.     The 2008 Fraudulent Transfers were accomplished by internal accounting entries on Clearstream's books in Luxembourg. Although the book entries changed the record ownership in order to make it appear as though Markazi did not have any interest in the financial assets in Account 13061, the beneficial ownership of the transferred assets did not change. As Markazi, Clearstream, and UBAE intended, Markazi continued to own the sole beneficial interest in the Citibank Bonds, the JPMorgan Bonds, and all principal and interest payments relating to them, as well as the sole beneficial ownership of any other financial assets transferred from Markazi's Clearstream account to Account 13061.

82.     Markazi maintained full control over all financial assets transferred into Account 13061 and full authority to direct the disposition of all financial assets maintained in Account 13061. At all times, Clearstream and UBAE acted as Markazi's agents and agencies of Iran in connection with the financial assets in Account 13061, including specifically the Citibank Bonds and JPMorgan Bonds.

83.     Markazi, Clearstream, and UBAE made the 2008 Fraudulent Transfers for the specific purpose of concealing Iran's and Markazi's continued financial activity in the United States and with the actual intent to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Plaintiffs.

### J.      The Fraudulent Transfers Enabled Markazi to Continue Receiving Principal and Interest Payments Relating to the Citibank Bonds and the JPMorgan Bonds in the United States

84.     Both before and after the 2008 Fraudulent Transfers, significant commercial activity occurred in the United States to provide Markazi the financial remuneration arising from its beneficial ownership in the Citibank Bonds and the JPMorgan Bonds. The Citibank Bonds and the JPMorgan Bonds were all denominated in U.S. dollars. The Citibank Bonds were physically held for safekeeping in the United States.  The JPMorgan Bonds were foreign branches or affiliates of United States financial institutions.

85.     The terms of the Citibank Bonds and the JPMorgan Bonds provided that all payments of periodic interest and payments of principal at maturity were to be made by the issuers were sent from a bank in New York in U.S. dollars and were to be received by Clearstream into accounts at banks in New York in U.S. dollars.

86.     In conformity with those terms, Clearstream, received all payments of periodic interest and payments of principal at maturity at its Citibank Account (in the case of the Citibank Bonds) and at its JPMorgan Account (in the case of the JPMorgan Bonds). Upon receipt by

Clearstream, Markazi was the sole beneficial owner of the interest and principal payments held in the respective bank accounts.

87.     Before the 2008 Fraudulent Transfers, Clearstream credited Markazi's Clearstream Luxembourg account with the full value of each deposit of interest or principal relating to the Citibank Bonds and the JPMorgan Bonds. After the Fraudulent Transfers, and with the intent to further the Conspiracy, Clearstream credited Account 13061 with the full value of each deposit of interest or principal relating to the Citibank Bonds and the JPMorgan Bonds.

88.     Clearstream did so knowing that the assets credited to Account 13061 belonged solely to Markazi despite being held in an account in the name of UBAE.

89.     Clearstream's acts to credit the interest and principal payments to Account 13061 was intended to give the false appearance that UBAE, and not Markazi, owned all right, title, and interest in the Citibank Bonds and the JPMorgan Bonds.

90.     Nevertheless, both before and after the 2008 Fraudulent Transfers, Markazi, Clearstream, and UBAE knew, and intended, that Markazi owned the sole beneficial interest in all interest and principal payments relating to the Citibank Bonds and the JPMorgan Bonds.

91.     The actions undertaken by Clearstream, Markazi, and UBAE to credit Account 13061 with the full value of each deposit of interest and principal was in furtherance of the Conspiracy and intended to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Plaintiffs, by attempting to (1) hide Markazi's beneficial ownership in the financial assets maintain in Account 13061 and (2) to try and place the financial assets in Account 13061, together with any payments of interest and principal relating to the JPMorgan Bonds beyond the reach of United States' courts.

K.    **The Citibank Bonds and the JPMorgan Bonds, Together with Any Payments of Interest or Principal Relating to Either Set of Bonds, Were Restrained in June 2008**

92.    On June 13, 2008, victims of Iran's terrorist activities relating to the 1983 bombing of the United States Marine Corps Barracks in Beirut, Lebanon ("Peterson Plaintiffs") served Citibank with a writ of execution issued by this Court seeking to execute on the Markazi- Citibank Bonds, together with any payments of interest or principal on deposit in Clearstream's Citibank Account.

93.    On June 16, 2008, the Peterson Plaintiffs served Clearstream with a restraining notice pursuant to NY CPLR 5222. Under New York and federal law, the restraining notice restrained any transfer of the Citibank Bonds, the JPMorgan Bonds, any payments of interest or principal relating to either set of bonds, and any other asset of any kind in which Markazi held any right or interest.

94.    On October 27, 2008, the Peterson Plaintiffs served Clearstream with a writ of execution issued by this Court seeking to execute on, among other things, any property in which Markazi had an interest, which by definition would also include the Citibank Bonds, the JPMorgan Bonds, and any payments of interest or principal relating to the bonds.

95.    Under New York and federal law, the writs of execution and restraining notices (collectively, "Restraints") restrained the Citibank Bonds, the JPMorgan Bonds, and any payments of interest or principal relating to those bonds. The Restraints have been extended by court order and remain in effect.

96.    In June 2008, after being served with the Restraints, Clearstream opened Account 13675, which it has identified as a "sundry blocked account" created for the purpose holding any payments of interest or principal relating to the Citibank Bonds and the JPMorgan Bonds after June 2008. After opening Account 13675, Clearstream credited Account 13675 with all payments of

interest or principal relating to the Citibank Bonds and the JPMorgan Bonds and stopped crediting Account No. 13061.

97.     On June 27, 2011, the Southern District of New York entered an Order in the Peterson case authorizing third-party interpleader complaints and/or petitions.

### L.     Markazi, Clearstream, and UBAE Continued Their Efforts to Hinder, Delay, and Defraud Judgment Creditors After the Markazi-Clearstream Bonds and Markazi-JPMorgan Bonds Were Restrained

98.     Between July 8, 2008 and January 31, 2012, issuers of the JPMorgan Bonds deposited 60 payments of principal and interest totaling more than $1.5 billion into Clearstream's JPMorgan Account ("2008-2012 JPMorgan Bond Proceeds"). Because Markazi, and only Markazi, possessed the beneficial ownership interest in the 2008-2012 Bond JPMorgan Proceeds, each payment, upon deposit, became property of Markazi and, as a consequence, became subject to the Restraints.

99.     In knowing violation of the Restraints, and in furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Plaintiffs, Clearstream knowingly and intentionally transferred the 2008-2012 JPMorgan Bond Proceeds out of Clearstream's JPMorgan Account to Account 13675 at Clearstream Luxembourg ("2008-2012 Fraudulent Transfers").

100.    As a result of the 2008-2012 Fraudulent Transfers, and in furtherance of their Conspiracy, Markazi, Clearstream, and UBAE assert that the 2008-2012 JPMorgan Bond Proceeds are outside this Court's jurisdiction and are no longer subject to execution in United States courts by Iran's and Markazi's judgment creditors, including the Plaintiffs.

### M.     On February 5, 2012, President Obama Signed Executive Order 13599 Freezing All of Bank Markazi's Funds in the United States

101.    On December 31, 2011, President Obama signed the National Defense Authorization

Act of 2012 into law. Among other provisions, Congress adopted a November 21, 2011 United States Department of Treasury finding that Markazi had used a variety of schemes to help other sanctioned Iranian banks to transfer billions of dollars in an effort to "evade sanctions." Congress also adopted the Treasury Department's finding that Markazi posed "terrorist financing, proliferation financing, and money laundering risks for the global financial system." National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245(a)(1)-(3), 125 STAT. 1647. Congress directed President Obama to freeze all of Markazi's assets in the United States or otherwise within the control of a U.S. person. National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1245(c)-(d), 125 STAT. 1647-48.

102.    President Obama implemented § 1245 of the NDAA of 212 by issuing Executive Order 13599 on February 5, 2012. E.O. 13599 freezes all assets in the United States or otherwise within the control of a United States person in which Markazi or any other Iranian bank had an interest.

103.    Clearstream and JPMorgan are both United States persons within the meaning of Executive Order 13599 and, therefore, were obligated to block all assets coming into their custody or possession in which Markazi had any interest. Moreover, Clearstream and JPMorgan were obligated to block all Markazi assets deposited into the JPMorgan Account because the JPMorgan Account is located "in the United States." Executive Order 13599, § 1.

104.    Clearstream and JPMorgan had actual knowledge of Executive Order 13599 and their obligations to comply with its directive to freeze Markazi's assets. To ensure compliance with Executive Order 13599, Clearstream and JPMorgan implemented internal procedures and systems to monitor financial transactions conducted through their respective banking systems.

**N.    Even After Executive Order 13599, Clearstream, Markazi, and UBAE Continued Their Efforts to Hinder, Delay, and Defraud Judgment Creditors by Transferring More than $100 Million USD Outside the United States**

105.    On or about October 15, 2012, Clearstream received into its JPMorgan Account approximately $104 million USD relating to the JPMorgan Bonds for the benefit of Markazi ("Oct 2012 Bond Proceeds").

106.    Defendants knew the Oct 2012 Bond Proceeds belonged to Markazi and that Executive Order 13599 required them to block the funds.

107.    In knowing and intentional violation of Executive Order 13599, and in furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's judgment creditors, including the Plaintiffs, Clearstream transferred the Oct 2012 Bond Proceeds out of Clearstream's JPMorgan Account to Account 13675 at Clearstream Luxembourg ("Oct 2012 Fraudulent Transfers").

108.    In violation of Executive Order 13599, JPMorgan failed to block the Oct 2012 Fraudulent Transfers despite knowing that the Oct 2012 JPMorgan Bond Proceeds belonged to Markazi and were to have been blocked.

109.    As a result of the Oct 2012 Fraudulent Transfers, and in furtherance of the Conspiracy, Defendants now assert that the Oct 2012 Bond Proceeds are outside this Court's jurisdiction and are no longer subject to execution in United States courts by Iran's and Markazi's judgment creditors, including the Plaintiffs.

110.    As a result of Clearstream's knowing and intentional violations of U.S. sanctions, OFAC investigated the illegal transactions by Clearstream, Markazi, and UBAE.

111.    On or about January 15, 2014, Clearstream and OFAC entered into a settlement agreement under which Clearstream agreed to pay $151,902,000 in connection with its potential civil violations of U.S. sanctions against Iran.

112.    On or about April 2, 2014, the United States Attorney for the Southern District of New York opened a criminal investigation into Clearstream's participation in the Conspiracy.

**MARKAZI'S ASSETS AND INTERESTS ARE NOT IMMUNE FROM EXECUTION**

113.    Pursuant to 28 U.S.C. § 1610(a)(7), the 2008-2012 JPMorgan Bond Proceeds and Oct 2012 JPMorgan Bond Proceeds are not immune from execution in satisfaction of the Plaintiff's Judgment because the Plaintiff's Judgment relates to claims against the Judgment Debtors for which they are not immune under 28 U.S.C. §1605(a)(7) or Section 1605A.

114.    Pursuant to 28 U.S.C. Sections 1610(a)(l) and 1611(b), the 2008-2012 JPMorgan Bond Proceeds and Oct 2012 JPMorgan Bond Proceeds are not immune from execution because Iran has, explicitly and implicitly, waived any immunity that might otherwise apply to Markazi or Iran's other agencies and instrumentalities.

115.    The JPMorgan Bonds, the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 JPMorgan Bond Proceeds are also not immune from execution because the immunity provided to central banks by the FSIA does not apply to Markazi. In particular, Markazi does not hold the 2008-2012 JPMorgan Bond Proceeds and Oct 2012 JPMorgan Bond Proceeds for its own account because they are not held for normal central banking functions.

116.    Among other reasons, Markazi cannot demonstrate that the JPMorgan Bonds, the 2008- 2012 JPMorgan Bond Proceeds and the Oct 2012 JPMorgan Bond Proceeds were used for legitimate central banking purposes because:

a.   Markazi held the JPMorgan Bonds, the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 JPMorgan Bond Proceeds for commercial purposes;

b.   Markazi cannot pledge any of the assets held in its Clearstream account; and

c.   Markazi does not segregate its foreign currency reserve funds from money that it (i) utilizes to facilitate Iran's illicit efforts to develop WMDs and support international terrorism; (ii) maintains for the benefit of lran and Iran's agencies and instrumentalities; and (iii) derives from its role as the commercial banker involved in Iran's sale of oil.

117.    Among other reasons, Markazi is not entitled to the immunity afforded legitimate central banks because it is a rogue financial institution because:

a.  On November 21, 2011, three governments announced sanctions against Iran, Markazi, and other Iranian financial institutions.

b.  the United States Treasury Department designated Iran a jurisdiction of "primary money laundering concern" and imposed sanctions on Iran and Markazi under § 311 of the USA Patriot Act. It found that Markazi had a  long history of (i) engaging in illegal and deceptive actions to evade U.S. sanctions, finance terrorism, spread technology relating to weapons of mass destruction, and other, illicit Iranian government conduct, and (ii) encouraging Iranian state-owned banks to engage in those illicit practices. Finding that the Islamic Republic of Iran is a Jurisdiction of Primary Money Laundering Concern, 76 Fed. Reg. 72,756 (Nov. 25, 2011), available at https://www.govinfo.gov/content/pkg/FR-2011-11-25/pdf/2011-30332.pdf.

c.  The United Kingdom announced that British financial institutions would cut all financial ties with Iran's banks, including Markazi. The British government's announcement highlighted that its measures represented the "first time the British government has cut an entire country's banking sector off from the UK's financial sector."[4]

d.  The Canadian government adopted similar sanctions against Iran and Markazi.[5]

118.    When announcing the United States Treasury Department's sanctions against Markazi, then Secretary of the Treasury, Timothy Geithner, stated, "If you are a financial institution

---

[4]    http://www.telegraph.co.uk/news/worldnews/middleeast/iran/8904713/Britain-to-cut-financial-ties-with-Iranbanks George-Osborne-announces.html
[5] http://www.washingtonpost. com/world/middle-east/canada-joins-us-britain-to-impose-more-sanctions- on- iran-over-nuclear-program/2011/11/21/gIQAOvDfiN_story.html

and you engage in any transaction involving [Markazi] or any other Iranian bank operating inside or outside Iran, you are at risk of supporting Iran's illicit activities: its pursuit of nuclear weapons, its support for terrorism, and its efforts to deceive responsible financial institutions and evade sanctions."[6] He further stated that "[a]ny and every financial transaction with Iran poses grave risk of supporting" the same illicit activities and that "[f]inancial institutions around the world should think hard about the risks of doing business with Iran."

119.    Markazi is the principal financier of the Iranian oil supply chain, which is controlled by, and funds, the efforts of lran's Islamic Revolutionary Guard Corps ("IRGC"), which the United States Treasury Department designated a global terrorist organization on August 15, 2007 for its role in supporting terrorism and the acquisition and proliferation of weapons of mass destruction.[7]

120.    Markazi is a financial facilitator for more than twenty state-owned Iranian financial institutions that help to fund the terrorist activities by the IRGC.

121.    Markazi provides financing to Khatam al-Anbiya ("KAA"), a massive IRGC-controlled conglomerate, which has been sanctioned by the United Nations, the United States and the European Union for its role in supporting Iran's WMD proliferation activities.[8] Indeed, the United Nations, the United States, the European Union, Canada, Japan, and South Korea have designated KAA as a terrorist entity for its role in running Iran's nuclear and ballistic missile programs.[9]

122.    Markazi launders the funds that Iran uses to underwrite its sponsorship of international terrorism and its efforts to acquire weapons of mass destruction.

123.    Markazi is not entitled to the immunity afforded to legitimate central banks because

---

[6] http://www.treasury.gov/press-center/press-releases/Pages/tg1368.aspx.

[7] http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR200708140 1662.html. On August 15, 2007, the U.S. Department of Treasury named the IRGC as a Specially Designated National ("SDN") for the IRGC's role in supporting global terrorism and proliferation of weapons of mass destruction. http://www.washingtonpost.com/wp-dyn/content/article/2007/08/14/AR2007081401662.html

[8] http://online.wsj.com/article/SB10001424052970204443404577051061458557058.html?mod=googlenews

[9] U.S. Treasury, Executive Order 13382, October 25, 2007; UNSC Resolution 1929, June 9, 2010; EU Commission Regulation No. 532/2010

of the extensive efforts it undertook to hide its ownership of the JPMorgan Bonds, the 2008- 2012 JPMorgan Bond Proceeds, and the Oct 2012 JPMorgan Bond Proceeds. No legitimate central bank would have engaged in the subterfuge practiced by Markazi in order to hinder, delay, and defraud Iran's and Markazi's judgment creditors and conceal financial transactions in the United States.

124.    As a consequence, the Oct 2012 JPMorgan Bond Proceeds are not immune from execution. The Plaintiffs are therefore entitled to enforce the Plaintiff's Judgment pursuant to 28 U.S.C. § 1610.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

(Set Aside All Fraudulent Transfer -- NY Debtor & Creditor Law § 278)

125.    Plaintiffs repeat and reallege each of the preceding Paragraphs as if fully set forth herein.

126.    Markazi, Clearstream, and UBAE knowingly and intentionally entered into the Conspiracy to make the 2008 Fraudulent Transfers and the Oct 2012 Fraudulent Transfers (collectively, the "Markazi Fraudulent Transfers").

127.    Markazi, Clearstream, and UBAE undertook the Markazi Fraudulent Transfers with the actual intent to hinder, delay, and defraud the Plaintiffs, and other Iran judgment creditors, within the meaning of NY Debtor & Creditor Law § 276, and to evade the United States, European Union, and other international sanctions.

128.    Markazi, Clearstream, and UBAE further undertook the Markazi Fraudulent Transfers with the actual knowledge that Iran was a defendant in *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1 (D.D.C. 2007), which is an action for money damages within the meaning of NY Debtor & Creditor Law § 273-a.

129.    Defendants knew Iran, Markazi, and the other Iranian Judgment Debtors, were in

51

the process of being found civilly liable for money damages to the Plaintiffs when they made the Markazi Fraudulent Transfers. In addition, the Markazi Fraudulent Transfers were made without fair consideration.

130.     The Markazi Fraudulent Transfers, therefore, constitute fraudulent conveyances within the meaning of NY Debtor & Creditor Law § 270, *et seq.*

131.     The Plaintiffs' Judgment is final and remains unsatisfied. In addition, the Plaintiffs have obtained an order from the Court pursuant to 28 U.S.C. § 1610(c) authorizing them to enforce their Judgment against Iran and Markazi.

132.     Pursuant to NY Debtor & Creditor Law § 278, the Plaintiffs are entitled to set aside or annul each of the Markazi Fraudulent Transfers.

133.     The Plaintiffs are, therefore, entitled to an Order from the Court setting aside or annulling the Markazi Fraudulent Transfers, and each of them, and Markazi's effort to conceal its ownership interests in the JPMorgan Bonds and Oct 2012 JPMorgan Bond Proceeds.

134.     The Plaintiffs are also entitled to an Order compelling Defendants to disregard the Markazi Fraudulent Transfers and directing them restore all Markazi assets to Clearstream's JPMorgan Account so that the Plaintiffs can execute upon those assets in satisfaction of their Judgment.

135.     Alternatively, the Plaintiffs are entitled to compensatory damages against Markazi, Clearstream, and UBAE in an amount equal to the Plaintiff's Judgment.

136.     Pursuant to NY Debtor & Creditor Law § 276-a, the Plaintiffs are entitled to an aware of attorney's fees and costs of suit against Markazi, Clearstream, and UBAE.

## SECOND CLAIM FOR RELIEF
(Declaratory Judgment regarding Violation of ITSR, 31 C.F.R. § 560.212)

137.     The Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set

forth herein.

138.    Executive Order 13599, and ITSR 31 C.F.R. Part 360, § 211. blocked all assets belonging to Markazi in the United States effective February 6, 2012. As a result, on and after February 6, 2012, it became illegal for Markazi, Clearstream, UBAE, and JPMorgan to transfer any funds received into Clearstream's JPMorgan Account relating to the JPMorgan Bonds or the proceeds of those bonds.

139.    In furtherance of the Conspiracy to hinder, delay, and defraud Iran's and Markazi's creditors, and evade United States, European Union, and other international sanctions, Defendants knowingly and intentionally violated Executive Order 13599 by making the Oct 2012 Fraudulent Transfers.

140.    Pursuant to ITSR 31 C.F.R. 560.212(b) the Oct 2012 Fraudulent Transfers are "null and void." Consequently, as a matter of law, the transfers cannot "be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interests." *Id*.

141.    An actual controversy now exists between the Plaintiffs and the Defendants concerning the validity of the Oct 2012 Fraudulent Transfers.

142.    Pursuant to 28 U.S.C. § 2201, the Plaintiffs are entitled to a declaration that the Oct 2012 Fraudulent Transfers (1) violated Executive Order 13599 and ITSR 31 C.F.R. § 560.212(b); (2) are null and void; and (3) must be unwound and the funds returned to Clearstream's JPMorgan Account.

143.    Pursuant to 28 U.S.C. § 2202, the Plaintiffs are also to further relief compelling Defendants to comply with the Court's declarations.

## THIRD CLAIM FOR RELIEF
(Turnover – CPLR § 5225(b))

144.     The Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

145.     Markazi has a beneficial interest in the Oct 2012 JPMorgan Bond Proceeds, which Markazi and Clearstream contend are currently located in Account 13765 at Clearstream Luxembourg.

146.     Pursuant to NY Debtor & Creditor Law § 278, the Markazi Fraudulent Transfers must be set aside and annulled. All funds relating to the Markazi Fraudulent Transfers must be returned to Clearstream's JPMorgan Account

147.     Clearstream is a person in possession of assets belonging to Markazi within the meaning of CPLR 5225(b).

148.     CPLR 5225(b) provides, in relevant part, as follows:

> (b) Property not in the possession of judgment debtor. Upon a special proceeding commenced by the judgment creditor, against a person in custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as sufficient to satisfy the judgment, to the judgment creditor and, if the amount so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

149.     Litigants in federal court, such as the Plaintiffs, need not commence a "special proceeding" as contemplated by CPLR article 52. *See Northern Mariana Islands v. Millard*, 287 F.R.D. 204, 208 (S.D.N.Y. 2012).

150.     The Plaintiffs' rights to funds returned to Clearstream's JPMorgan Account are superior to the rights of Clearstream, UBAE, or JPMorgan, who are merely stakeholders or account

keepers.

151.     Pursuant to Fed. R. Civ. P. 69(a) and CPLR § 5225, the Plaintiffs are entitled to

an Order enforcing their Judgment by conveying, assigning, and directing payment to them all

of Markazi's right, title, and interest in the assets returned to Clearstream's JPMorgan Account,

as well as any proceeds thereof.

152.     The Plaintiffs are entitled to an award of attorneys' fees and costs of suit against

Markazi, Clearstream, and UBAE.

**FOURTH CLAIM FOR RELIEF**
(Turnover – CPLR § 5227)

153.     The Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set

forth herein.

154.     Pursuant to NY Debtor & Creditor Law § 278, the Markazi Fraudulent Transfers

must be set aside and annulled and all funds relating to the Markazi Fraudulent Transfers must be

returned to Clearstream's JPMorgan Account.

155.     Accordingly, Clearstream is a person who either is or will become indebted to

Markazi within the meaning of CPLR § 5227.

156.     Civil Practice Law and Rules 5227 of the New York Code provides, in relevant part,

as follows:

> Upon a special proceeding commenced by the judgment creditor, against
> any person who it is shown is or will become indebted to the judgment
> debtor, the court may require such person to pay to the judgment creditor
> the debt upon maturity, or so much of it as is sufficient to satisfy the
> judgment, and to execute and deliver any document necessary to effect
> payment; or it may direct that a judgment be entered against such person in
> favor of the judgment creditor. Costs of the proceeding shall not be awarded
> against a person who did not dispute the indebtedness.

157.     Litigants in federal court, such as the Plaintiffs, need not commence a "special

proceeding" as contemplated by CPLR article 52. *See Northern Mariana Islands v. Millard*, 287

F.R.D. 204, 208 (S.D.N.Y. 2012).

158.    Pursuant to Fed. R. Civ. P. 69(a) and CPLR § 5227, the Plaintiffs are entitled to an Order enforcing their Judgment by conveying, assigning, and directing payment to them all of Markazi's right, title, and interest in the assets returned to Clearstream's JPMorgan Account, as well as any proceeds thereof.

159.    The Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

160.    The Plaintiffs repeat and re-allege each of the preceding Paragraphs as if they were fully set forth herein.

161.    Plaintiffs hold judgments for compensatory damages against the Judgment Debtors, and can collect on the assets of their agencies and instrumentalities including Markazi, based on an act of terrorism or for which Iran and Markazi are not immune under 28 U.S.C. § 1605A or §1605(a)(7) (as such section was in effect on January 27, 2008).

162.    Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA § 201(d)(4), 116 Stat. at 2340.

163.    As set forth above, Markazi is an alter ego, agency or instrumentality of Iran.

164.    JPMorgan and/or Clearstream, both of which are United States persons as defined in Section 7 of Executive Order 13599, control or will control the payments of principle and interest relating to the JPMorgan Bonds. Moreover, payments of principal and interest relating to the JPMorgan Bonds, which were deposited into the JMP Account, constituted, upon deposit, "property and interests in property of the government of Iran, including the Central Bank of Iran, that [were] in the United States" within the meaning of Executive Order 13599, § 1.

165.   Consequently, the Oct 2012 JPMorgan Bond Proceeds deposited into Clearstream's JPMorgan Account in October 2012 were blocked assets as defined in TRIA.

166.   Similarly, all funds returned to Clearstream's JPMorgan Account pursuant to NY Debtor & Creditor Law § 278, and by virtue of this Court's judgment, will be, upon deposit, blocked assets as defined in TRIA.

167.   Plaintiffs are, therefore, entitled to an Order pursuant to TRIA, directing JPMorgan and/or Clearstream to turn over to the Plaintiffs all assets returned to Clearstream's JPMorgan Account, as well as any proceeds thereof.

168.   The Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

**SIXTH CLAIM FOR RELIEF**
(Rescission of All Markazi Fraudulent Transfers)

169.   The Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

170.   If, and to the extent that, any of the Oct 2012 Bond Proceeds are located outside the United States, the Court has the power to set aside any transfer made by Markazi, Clearstream, and UBAE that resulted those proceeds being removed from the United States pursuant to New York Debtor and Creditor Law §§ 273-a, 276 278, and New York common law.

171.   Markazi, Clearstream, and UBAE had actual knowledge of attempts by judgment creditors to execute on the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 Bond Proceeds as early as June 16, 2008 when the Peterson Plaintiffs served a restraining notice on Clearstream.

172.   The restraining notice had the effect of restraining Clearstream from transferring any of the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 JPMorgan Bond Proceeds from its JPMorgan Account.

173.    At all times since March 2008, Clearstream knew that Markazi beneficially owned the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 Bond Proceeds.

174.    After June 2008, any transfer of the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 Bond Proceeds from Clearstream's JPMorgan Account to Luxembourg, or any other location, was made as agent for Markazi, with intent to hinder, delay or defraud the Plaintiffs, and other judgment creditors, and was made without fair consideration.

175.    Clearstream, as agent for Markazi, is in possession or control of the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 Bond Proceeds even after the Markazi Fraudulent Transfers.

176.    As a result, the Court has the power to direct Clearstream and Markazi to take such actions as may be required to set aside the Markazi Fraudulent Transfers and return the October 2012 JPMorgan Bond Proceeds to Clearstream's JPMorgan Account.

177.    Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

### SEVENTH CLAIM FOR RELIEF
(Equitable Relief)

178.    The Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

179.    Pursuant to Fed. R. Civ. P. 69(a), federal and New York state common law, and the inherent equitable power of the Court, the Plaintiffs are, as an alternative remedy, entitled to a Creditor's Bill to reach the equitable interest of the Judgment Debtors in the Oct 2012 JPMorgan Bond Proceeds.

180.    To the extent that enforcement of the Plaintiff's Judgment against the Oct 2012 JPMorgan Bond Proceeds is unavailable through remedies at law, the Court should exercise its equitable powers to grant the Plaintiffs a Creditor's Bill.

181.    The Plaintiffs are entitled to a declaration by the Court that the Judgment Debtors have an ownership interest in the Oct 2012 JPMorgan Bond Proceeds.

182.    An objective weighing of the equities underlying the terrorism exception to the FSIA and TRIA, on the one hand, and those underlying any applicable legal remedies, on the other, compels the conclusion that the Court should use its equitable powers to grant the Plaintiffs a Creditor's Bill that will allow them to enforce their judgment against the Oct 2012 JPMorgan Bond Proceeds.

183.    The Court's exercise of discretion to grant a Creditor's Bill is reasonable and equitable here because, among other factors: (a) the Oct 2012 JPMorgan Bond Proceeds are readily traced by Clearstream; (b) Markazi, Clearstream, and UBAE entered into a conspiracy to knowingly and intentionally disguise and secret Markazi's identity as beneficial owner of the JPMorgan Bonds and the Oct 2012 JPMorgan Bond Proceeds in order to hinder, delay or defraud creditors, including the Plaintiffs; (c) Clearstream and UBAE knew, or should have known, that Markazi was the beneficial owner of the JPMorgan Bonds and the Oct 2012 JPMorgan Bond Proceeds; (d) Defendants have knowingly and intentionally conspired to evade United States, European Union, and international sanctions imposed because of Iran's long history of state sponsored terrorism against U.S. nationals, and aggressive and illicit efforts to develop WMDs; (e) applying that exception will serve the important policy interests codified in the FSIA, which promotes compensation of the victims of terrorism and the punishment of rogue terrorist nations, while doing no damage to the policies of fostering finality and speed in securities transactions.

184.    Moreover, applying a narrow exception in these circumstances is consistent with U.C.C. 8-112(e), which provides that "[a] creditor whose debtor is the owner of a ... security entitlement is entitled to aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process.

185.     Pursuant to the Court's equitable powers embodied in a Creditor's Bill and otherwise, the Plaintiffs are further entitled to an order directing Defendants to turnover to the Plaintiffs the Oct 2012 JPMorgan Bond Proceeds in partial satisfaction of the Judgment.

186.     The Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

### EIGHTH CLAIM FOR RELIEF
(Prima Facie Tort)

187.     The Plaintiffs repeat and re-allege each of the preceding Paragraphs as if fully set forth herein.

188.     Markazi, Clearstream, and UBAE entered into the Conspiracy, and undertook the Markazi Fraudulent Transfers, with the actual intent to hinder, delay, defraud the Plaintiffs. Thus, Markazi, Clearstream, and UBAE acted with the intent to inflict harm on the Plaintiffs.

189.     Markazi, Clearstream, and UBAE did not have any excuse or justification for the harm they intended to cause, and have in fact caused, by participating in the Conspiracy and undertaking the Markazi Fraudulent Transfers.

190.     Markazi, Clearstream, and UBAE undertook the Markazi Fraudulent Transfers with the malicious intent to harm the Plaintiffs by preventing them from enforcing the Plaintiff's Judgment.

191.     As a direct and proximate cause of the Conspiracy and the Markazi Fraudulent Transfers, the Plaintiffs have suffered the following special damages as a result of Markazi, Clearstream, and UBAE putting the JPMorgan Bonds and the Oct 2012 JPMorgan Bond Proceeds beyond the jurisdiction of United States courts: (i) compensatory damages in the amount of the Plaintiff's Judgment; (ii) pre-judgment interest; (iii) accruing post-judgment interest; and (iv) costs.

192.     The Conspiracy and the Markazi Fraudulent Transfers were undertaken with malice, spite, ill will, vengeance or deliberate intent to harm the Plaintiffs. Accordingly, the Plaintiffs are entitled to an award of punitive damages.

193.     The Plaintiffs are also entitled to an award of attorneys' fees and costs of suit against Markazi, Clearstream, and UBAE.

WHEREFORE, the Plaintiffs ask the Court to enter Judgment against Defendants, and each of them, as follows:

1.     An Order setting aside all Markazi Fraudulent Transfers.

2.     An Order conveying, assigning, and directing the transfer to the Plaintiffs of all rights, title, and interest of Markazi in the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 JPMorgan Bond Proceeds.

3.     An award of compensatory damages against Defendants, together with interest at the legal rate.

4.     An Order declaring that the Oct 2012 Fraudulent Transfers (1) violated Executive Order 13599 and ITSR 31 C.F.R. § 560.212(b); (2) are null and void; and (3) must be unwound and the funds returned to Clearstream's JPMorgan Account.

5.     Alternatively, a Creditor's Bill allowing the Plaintiffs to attach the 2008-2012 JPMorgan Bond Proceeds and the Oct 2012 JPMorgan Bond Proceeds if they are not otherwise reachable by any legal remedy.

6.     An award of attorneys' fees and costs incurred by the Plaintiffs in connection with prosecuting the claims in this Complaint.

7.     For such other and further relief as the Court may deem appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury herein.

Dated:  August 26, 2020

Respectfully submitted,

**THE MILLER FIRM, LLC**

/s/ Edward Maggio
Edward Maggio
Michael J. Miller
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Telephone: (540) 672-4224
emaggio@millerfirmllc.com

**MM~LAW LLC**

/s/ Gavriel Mairone
Gavriel Mairone
MM~LAW LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Telephone: (312) 253-7444
Fax: (888) 966-0262
CTlaw@mm-law.com

Adora Sauer
MM~LAW LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Telephone: (312) 253-7444
Fax : (888) 966-0262
Adora@mm-law.com

**Wheeler & Franks Law Firm, P.C.**
William Wheeler
Jamie Franks
114 South Broadway Street
Tupelo, MS 38804
Telephone: (662) 842-0380
wwheeler@erwheelerfrankslaw.com
jfranks@wheelerfrankslaw.com

*Attorney for Plaintiffs*